IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

```
                                  )
                                  )
DEBORAH M. FISHER,                )
                                  )
                                  )   CIVIL ACTION NO. 02-1920
             Plaintiff,           )
                                  )
                                  )
       v.                         )
                                  )
                                  )
MICHAEL J. ASTRUE,                )   JUDGE GARY L. LANCASTER
Commissioner of Social            )   MAGISTRATE JUDGE CAIAZZA
Security,                         )
                                  )
                                  )
             Defendant.           )
                                  )
```

## REPORT AND RECOMMENDATION

### I. RECOMMENDATION

Acting pursuant to 42 U.S.C. § 405(g), Deborah Fisher ("Fisher" or "the claimant") appeals from a final decision of the Commissioner of Social Security ("the Commissioner") that she was no longer disabled due to: 1) medical improvement in the condition underlying her initial disability determination; and 2) the lack of evidence showing a continuing disability. Cross-motions for summary judgment are pending. It is respectfully recommended that the Commissioner's Motion (Doc. 13) be granted, and that the Claimant's Motion (Doc. 9) be denied.

## II. REPORT

### A. PROCEDURAL SUMMARY

On January 24, 2000, Fisher filed an application for disability insurance benefits, alleging that she had been disabled since December 16, 1998 when she was attacked from behind by a retarded autistic patient in a care facility where she worked. Following denial of her claim initially and on reconsideration, Fisher requested a hearing, which took place before an Administrative Law Judge ("ALJ") on February 8, 2001.

On April 24, 2001, the ALJ issued a decision finding that Fisher was disabled as of the date alleged and for a period thereafter. He found, however, that due to medical improvement and her consequent ability to perform a wide range of work available in substantial numbers in the national economy, Fisher's disability ceased as of June 10, 2000. The Appeals Council denied her request for review, making the ALJ's opinion the final decision of the Commissioner. A timely appeal followed.

On appeal, District Judge Gary L. Lancaster granted the Commissioner's motion for a voluntary remand. Because a portion of the recording of the administrative hearing was unavailable for transcription, the ALJ was directed to conduct a second hearing.

On June 27, 2003, while her original application for benefits was under evaluation, Fisher filed a second claim alleging that

2

she was entitled to supplemental security income benefits. This
claim was not processed through usual administrative channels.
Because each of Fisher's claims turned on the issue of disability,
they were consolidated for consideration by the ALJ at the hearing
on remand.

On July 13, 2004, the second hearing was held. Fisher, a
thirty-eight year old high school graduate with one year of
college, was represented by counsel and gave testimony. Her ex-
husband and a vocational expert also testified.

In an opinion dated September 20, 2005, the ALJ reviewed the
applicable law and summarized the relevant evidence. He then
concluded that from December 16, 1998 through June 10, 2000,
Fisher suffered from mental impairments that met listings 12.04
and 12.06 set out at 20 C.F.R., Subpart P, Appendix 1. He also
concluded that after June 10, 2000, Fisher experienced medical
improvement to the extent that her impairments no longer satisfied
the listings. Though Fisher continued to suffer from symptoms
stemming from mental impairments, these symptoms were not severe
enough to prevent her from working.

Concluding that Fisher was no longer disabled, the ALJ took
into account Fisher's alleged medical impairments, finding "the
claimant has had severe generative disc disease of the cervical
spine with radiculopathy, as well as impingement syndrome of the
left shoulder." (R. 38). These impairments did not, however,
negate Fisher's ability to engage in substantial gainful activity.

"The claimant has not pursued regular medical treatment for any of the symptoms upon which she bases her allegation of ongoing severe, even debilitating symptoms. . . Here, the degree of treatment has been so limited that I simply cannot find the claimant's allegations to be credible." (R. 41).

In light of al of Fisher's alleged impairments, the ALJ asked the vocational expert to assume a hypothetical person of the claimant's age, education, and work experience who could perform light work, but could not use her non-dominant left upper extremity except as a "helper" limb; she could do only occasional stooping, crouching, climbing, balancing, kneeling, or crawling; she could not stand for more than two hours, or walk for more than one hour in an eight hour work day. The remainder of the work day would be spent sitting with a sit/stand option. The claimant could not work in environmental extremes or around fumes odors, or gasses. She could understand, remember, and carry out simple instructions. She could not engage in significant decision making, or deal with the general public, and could not tolerate workplace changes or intensive supervision.

The vocational expert testified that jobs accommodating a person with the residual functional capacity described were available in significant numbers in the national economy.

The ALJ then concluded that Fisher was not disabled within the meaning of the Social Security Act and was not, therefore, entitled to disability insurance benefits outside the time period

4

specified, or to supplemental security income benefits.

## B. <u>STANDARD OF REVIEW</u>

The Act limits judicial review of the Commissioner's final decision regarding benefits to these questions – whether the factual findings are supported by substantial evidence, <u>Brown v. Brown</u>, 845 F.2d 1211, 1213 (3d Cir. 1988), and whether the correct law was applied. <u>Coria v. Heckler</u>, 750 F.2d 245, 247 (3d Cir. 1984).

## C. <u>ANALYSIS</u>

### 1. <u>The Statutory Framework</u>

The Social Security Act, 42 U.S.C. §§ 423(f)(1), 1382c(A)(4), provides that a recipient may be deemed ineligible for benefits if it is determined that his or her disability has ceased. That determination must be supported by substantial evidence of medical improvement and the claimant must be able to engage in substantial gainful activity. In deciding whether there has been medical improvement, the Commissioner considers only the impairment(s) present at the time of the most recent decision finding the claimant to have been disabled. 20 C.F.R. §§ 404.1594(b)(7), 416.994(b)(7). If, however, a new severe impairment began in or before the month in which the claimant's last impairment ended, she may still be found disabled.

The provisions of 20 C.F.R. §§ 404.1594(f) and 416.994(b)(5) establish a sequential multi-step inquiry applicable to termination decisions.[1] If, at any point, there is sufficient evidence to support a finding that the claimant remains unable to engage in substantial gainful activity, the inquiry ends, and benefits will be continued. The ALJ listed these sequential steps and the applicable exceptions, discussing each of them with reference to the record evidence. His analysis ended at the final step, when he concluded that Fisher was not entitled to disability insurance benefits after June 10, 2000, or to supplemental security income benefits, because she was capable of performing available work.

---

[1] The implementing regulations require that the termination analysis be conducted with reference to the following questions: 1) Does the claimant have an impairment or combination of impairments which meets or equals the severity of an impairment listed in Appendix 1? If so, the disability is continuing; 2) Has there been medical improvement - i.e. has there been a change in the symptoms, signs, and/or laboratory findings associated with the impairment? If there has not been a decrease in medical severity, there is no medical improvement; 3) If there has been medical improvement, is it associated with the ability to do work - i.e. has there been a decrease in the severity of the impairment(s) identified at the time of the most recent comparison point and an increase in the functional capacity to do basic work activities? 4) If there has been no medical improvement or if the medical improvement is not related to the ability to do work, do any of the listed exceptions to medical improvement apply? If none of the exceptions specified applies, termination is improper; 5)If there has been medical improvement relating to the ability to do work, or if one of the specified exceptions applies, is the combination of current impairments severe? If not, the disability has ended; 6) If current impairments are severe, can the claimant return to past relevant work? If the answer is yes, the disability has ended; 7)If the claimant cannot return to past relevant work, is she able to perform other substantial gainful activity? If yes, disability has ended. *See* <u>Griego v. Sullivan</u>, 940 F.2d 942, 944 n.1 (5th Cir. 1991)(applying termination of benefits criteria in context of disability insurance benefits, 20 C.F.R. 404.1594).

## 2. <u>The Allegations of Error</u>

The claimant argues that the ALJ erred in determining that her disability ended in June 2000, because "she continued treatment for her numerous mental health problems" and also suffered from  unremitting pain caused by the 1998 injuries to her neck and back. (Doc. 11 at 10). The essence of Fisher's claim on appeal is that the ALJ improperly discounted the findings of her treating physicians, Drs. Trachtman and Ham, that she was incapable of performing even sedentary work.

## 3. <u>The Evidence Regarding Medical Improvement</u>

There is no question that immediately following the assault that underlies this claim, Fisher suffered serious mental and physical deficits. There is also no question that these deficits - particularly the mental impairments - persisted for more than a year. The ALJ recognized this fact when he found that Fisher was disabled because she met two relevant mental impairment listings during the period extending from the time of her injury until June 2000. It is also undisputed that in and after June 2000, Fisher was not symptom-free, in either a mental or physical sense. What *is* disputed is whether Fisher's overall condition improved to the point where she could no longer be considered disabled within the meaning of the relevant law.

The court's task is limited. It must determine whether substantial evidence supports the ALJ's finding that Fisher was, as of June 2000, capable of engaging in substantial gainful employment in positions available in significant numbers in the national economy.

The record evidence pertaining to the period prior to June 2000 focuses primarily on the psychological effects of the 1998 assault. The treatment records supplied by Anne Toland, Ph.D., a psychologist, Ian Slater, M.D., a psychiatrist, Helena Nakama, M.D., a psychiatrist, and William Trachtman, M.D., a physiatrist, document that Fisher suffered from a number of mental impairments. These included depression, anxiety, post-traumatic stress disorder, obsessive-compulsive disorder, and neck and back pain - all originating in the work-related assault.

Although Fisher received medical treatment immediately following the attack, the focus of her on-going treatment was mental health related. It was her psychological impairments that provided the basis for the ALJ's disability determination.

The court's initial focus, therefore, is on the factors that led the ALJ to conclude that there had been improvement in Fisher's psychological condition. In March 2000, Dr Trachtman wrote that Fisher reported "improvement stating that in general she feels better. Her medications have been increased by her psychiatrist. She is now sleeping six hours straight . . . . She says she always feels tired and worn out and wonders if it's the

medication. Her nerves are better, however." (R. 261). In the same
notes, he states that Fisher exhibited improved affect and
anxiety, that her reflexes were brisk and symmetric, and that her
lumbar range of extension was ninety degrees. Her back pain
without medication was scaled at 5 out of a possible ten. Dr.
Trachtman also wrote, " She tries to do a little more at home and
most times can complete things." Id. He recommended that she
increase her activity outside the home, noting that she planned to
volunteer at her children's school. "She is going to try to do
this five times between now and her next visit." (R. 261).

On June 29, 2000. Dr Trachtman completed a work capacity form
indicating that Fisher could sit for eight hours in an eight hour
workday, stand for four, and walk and drive for two. (R. 321). She
could frequently lift or carry ten pounds, and could occasionally
lift or carry up to twenty. She was able to perform all postural
movements occasionally, including reaching above her shoulder, and
grasping and manipulating objects. No restrictions were placed on
her ability to work at unprotected heights or to move machinery.
She had mild limitations in her ability to accommodate temperature
changes. Id. Despite these unremarkable physical findings, Dr.
Trachtman concluded that Fisher was unable to work: "Psychological
status precludes functional gainful employment at this time."  Id.

Dr. Trachtman completed a second form on February 13, 2001,
giving the identical responses except for a notation that Fisher
was capable of using both hands and feet in repetitive movements.

9

(R. 393). He again concluded that Fisher was unable to work because she had "multiple issues regarding her ability to handle stresses of employment." Id. The medical record does not contain additional records generated by Dr. Trachtman.

At about the time that the ALJ determined that Fisher's disability ended, Fisher was also being seen by a psychiatrist, Helena Nakama. On May 12, 2000, Dr. Nakama reported that Fisher was "generally feeling better." (R. 320). Her panic attacks had decreased to about once a week, and she was able to control them with deep breathing techniques. She was still anxious and avoided going out, although she did attend her son's little league game. She had some periods of calm in her day and was less tired. Id. On June 10, Dr. Nakama wrote that Fisher was "much improved over past two months" and she "look[ed] much calmer!" (R. 319). She felt calm and tired, and had not had a panic attack in the last month. Her hands were less red and irritated from too much washing. She had been able to leave her home to go to the grocery store without feeling frightened, and was sleeping well. Her ability to interact was fair. Her prescription for Ativan was discontinued. Id. There are no medical records from Dr. Nakama after this date.

In December 2000, Fisher saw psychiatrist Satish Narayan, pursuant to a referral from Dr. Trachtman. She complained of chronic pain. Dr. Narayan did not know what pain management methods had been tried. Fisher reported that her obsessive compulsive symptoms were much better. She had a boyfriend, and

described this relationship as "fairly good." (R.323) Her panic attacks were limited to about once every two weeks. She was moderately depressed and anxious, but "was able to enjoy laughter as in response to humor." Id. Dr. Narayan noted that the claimant demonstrated good memory, average intelligence, fair judgment, and fair insight. He also noted that she may have become addicted to pain medication. (R. 323). It does not appear that Fisher saw Dr. Narayan again. Also in December 2000, Fisher saw a social worker. The clinician noted the presence of depression and anxiety, but assigned the claimant a GAF of 55, indicating only moderate limitations in functioning. Fisher had missed three of eight appointments. Id.

The record does not show that Fisher received additional medical or psychological treatment until 2003. In January 2003, she entered a drug treatment program for addiction to prescription medication and cocaine, which she completed successfully one month later. At that point, the record of mental health treatment ends.

In May 2003, Dr. Tong Ho Ham, a family practitioner, saw Fisher, recording that she complained of right shoulder pain and numbness in her left hand. Fisher again saw Dr. Ham in July 2003, requesting flu and pneumonia vaccines. (R. 418). She told Dr. Ham that she had seen Dr. Brian Shannon for neck and arm pain and had received or would receive injections in her shoulder and wrist.

In August 2003, Dr. Shannon saw Fisher, noting her "complaints of approximately seven months of progressive neck and

11

left sided arm pain and numbness." (R. 434). She stated that the pain worsened through the day and "that activities like doing the laundry and things will cause it to be aggravated also." Id. She also complained of intermittent numbness in her thumb and first finger." Id. The claimant had "tried Naprosyn . . . which really has not helped all that much and really has not been doing anything else." Id. Fisher had full range of motion of the left elbow and wrist. Decreased sensation was noted over the dorsum of the thumb and one finger. Her radial pulse was two out of four.

Dr. Shannon theorized that her shoulder pain was consistent with an impingement syndrome, but could not tell whether it was carpal tunnel related, or if the source of the pain was in her neck.

On August 19, 2003, Dr. Shannon reported that an injection had made Fisher's "shoulder feel quite a bit better." (R. 432). The neck pain and the pain and numbness in her wrist and fingers persisted. She exhibited a decreased range of motion with side bending, left and right, and had pain at the medial border of the scapular spine on the left. Dr. Shannon prescribed Bextra, and gave her a prescription for physical therapy, including traction of the neck. On the prescription, he noted that Fisher's prognosis was "good". He also recommended home cervical traction, and trigger point injections. (R. 432). Fisher declined to have the injections. There is no record that she saw Dr. Shannon again, or that she attended physical therapy.

12

In December 2003, Dr. Ham noted that he had received a
disability form from Fisher's attorney. Dr Ham completed the form,
finding that Fisher could sit for five hours in an eight hour work
day, sit and walk for three, and drive for one. She could never
lift ten pounds with her left arm, could not carry ten pounds with
her left arm, and could never push and pull with her left arm. She
could climb and balance occasionally, never stoop, squat, or bend
due to back pain, and could never reach above her shoulder, grasp
objects, or manipulate objects with her left hand. She could make
repetitive movements with her right, but not her left hand, and
could use her feet in repetitive movements. She could not work in
unprotected heights, around moving machinery, or around dust,
fumes, and gasses. She had moderate limitations with respect to
temperature changes. (R. 400). In Dr. Ham's opinion, Fisher was
precluded from all work.

On the same date, Dr. Ham also completed medical
interrogatories submitted to him by Fisher's attorney. He
indicated that Fisher suffered from degenerative disc disease in
the cervical area, resulting in chronic pain in her left arm and
shoulder, and weakness in her left arm. (R. 401). In Dr. Ham's
opinion, Fisher was not capable of even sedentary work because she
could not "carry or lift or work with" her left arm. Id. He also
wrote that she was impaired due to obsessive compulsive disorder,
washing her hands constantly and "double checking everything." Id.
He noted that she also "has anxiety" and a history of substance

13

abuse. <u>Id</u>. In articulating these findings, Dr. Ham did not refer to records documenting these disorders, nor did he mention diagnostic data. According to Dr. Ham, Fisher had several injections in her neck which did not help. The record does not show when or by whom these injections were administered.

The record also fails to show that Fisher saw Dr. Ham again for any reason until March 2004 when she complained of "an increase in the size of her stomach in the last two to three weeks" and " pain in the right side of her back last night." (R. 414). She also complained of chest pain. The record does not indicate that Fisher saw Dr. Ham again.

In February 2004, Fisher underwent a consultative examination by orthopedic surgeon Jerome H. Bonier, M.D. According to Dr. Bonier, Fisher complained of pain in the cervical spine. He stated that she had been treated with physical therapy on two or three occasions with no relief. He also stated that she "has had injection therapy, multiple X-rays, an MRI and a CAT scan with no relief of her symptoms." (R. 407)[2]. Her only pain medication was Naproxyn. The pain in her spine radiated into her upper arm, with parasthesias and numbness, causing her to drop objects from her left hand. She reported not being able to drive long distances and worrying that her arm would "give out."

_____

[2]The record does not include reports of X-rays other than those - which were normal- taken in the hospital immediately after the attack in 1998. Furthermore, the record does not contain reports documenting that Fisher underwent physical therapy, an MRI, or a CAT scan.

Dr. Bonier noted tenderness in the left trapezius muscle. His impression was that she had a chronic cervical strain and sprain superimposed on possible degenerative disc disease. He wrote, "I feel that this patient should attempt to continue utilizing her neck as much as possible and continue with her Naproxin Sodium. I did not recommend any further therapy at the present time." (R. 408).

### 4. <u>Findings</u>

Having conducted a thorough review of the evidence and the ALJ's analysis, the court concludes that the ALJ's decision with respect to medical improvement and continuing disability is amply supported by the evidence. In fact, the court finds that it has little to add to the ALJ's opinion. The medical evidence pertaining to Fisher's alleged mental and physical impairments after June 2000 is sparse, and the items in the record on which Fisher places primary reliance are inconsistent with and unsupported by diagnostic data or other medical evidence of record. Dr. Trachtman, who was not a psychological or psychiatric practitioner, based his conclusion that Fisher could not work on her mental impairments. Significantly, he did so at the very time that her psychologist and psychiatrist noted that Fisher was much better. It is also noteworthy that Dr. Trachtman, whose specialty

was physical medicine, did not indicate that Fisher suffered from debilitating back pain or other physical impairments. In fact, his reports indicate that Fisher was, from a physical standpoint, quite capable of performing sedentary work.[3]

Dr. Ham's opinion that Fisher was incapable of working is equally flawed. His records do not support the finding that Fisher could not work. As the ALJ pointed out, "Dr. Ham did not say how often he had seen the claimant, the specific clinical observations that supported his diagnoses and functional assessments, or the nature of the treatment (if any) he had provided." (R. 36). Dr. Ham stated that Fisher suffered from degenerative disc disease, but failed to say how or by whom that condition was diagnosed. The records do not show that Dr. Ham saw or treated Fisher prior to 2003, that he ever conducted a physical examination or reviewed her records after 2003, or that he did any regular follow up with respect to her pain. Apparently, he did not order X-rays or other diagnostic tests, and did not initiate any aggressive treatment for what he terms a disabling condition. The ALJ commented on Ham's assessment of Fisher's limitations as follows:

> I note . . . that the doctor's statement
> that the claimant cannot do sedentary work

---

[3]It is significant that when Dr. Shannon saw Fisher in August 2003, he recorded that Fisher told him that the pain in her arm and shoulder had begun about seven months prior, which would have been about February 2003, years after her period of disability was found to have ended.

16

> is supplemented by the clause "unable to
> carry or lift or work with L arm" but no
> other specific limitations. If the doctor
> intended to state that sedentary jobs
> require the use of both upper extremities,
> as it appears he did, such a statement is
> outside his expertise and addresses an
> issue properly to be considered by a
> vocational expert. For these reasons I
> dismiss his opinion on the issue of
> disability and his subsidiary ratings of
> the claimant's ability to do various physical
> and mental activities.

(R. 37)(citations omitted).

It is true, as Fisher argues, that "[a] cardinal principle guiding disability eligibility determinations is that the ALJ accord treating physicians' reports great weight, especially when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time." Morales v. Apfel, 225 F.3d 310, 317 (3d. Cir. 2000). It is also true that "[the] ALJ may reject a treating physician's opinion outright only on the basis of contradictory medical evidence." Lockley v. Barnhart, Civ. No. 05-05197, 2006 WL 1340866 at*4 (E.D. Pa. May 16, 2006)(citing Newhouse v. Heckler, 753 F.2d 283, 286 (3d. Cir. 1984)). This does not, however, mean that a treating physician's opinion is sacrosanct. The regulations make clear that there are factors - present in this case - which may favor rejecting or diminishing the weight given to that opinion.

The ALJ is authorized to consider the nature and extent of the treatment history, 20 C.F.R. §§ 404.1527(d)(2)(ii), 416.927(d)(2)(ii), the extent to which the opinion is explained

17

and supported by other evidence in the record, 20 C.F.R. §§ 404.1527(d)(3),416.927(d)(3), whether the opinion is consistent with the entire record, 20 C.F.R. §§ 404.1527(d)(4), 416.927 (d)(4), and the extent of the source's familiarity with the other evidence of record.

The ALJ in this case fully explained his rejection of the disability determinations reached by Drs. Trachtman and Ham. He compared their findings to the those of Fisher's other treating physicians, and to the observations of the examining and consultative physicians. He properly noted and discussed gaps in the treatment records. He also observed - especially since the time that her disability was found to have ended - that Fisher does not appear to have pursued a course of treatment consistent with her claims of debilitating physical and mental symptoms.

This is not to say that Fisher has not suffered mentally and physically as a consequence of the 1998 trauma. However, operating within the confines of the narrow standard of review, the court is constrained to conclude that the record submitted to and analyzed by the ALJ contains substantial evidence supporting his findings with respect to medical improvement and the absence of continued disability. The court is fully satisfied with the ALJ's analysis of the evidence of record and his application of the law.

### III. **CONCLUSION**

For the reasons set out above, the court recommends that the Motion for Summary Judgment filed by the Commissioner (Doc. 13) be granted and that the Motion for Summary Judgment (Doc. 9) filed by the claimant be denied.

In accordance with the Magistrate's Act, 29 U.S.C. § 636 (b) (1) (B), 636 (b)(1)(b) and (c), and Rule 72.1.4 (B) of the Local Rules for Magistrates, objections to this Report and Recommendation are due by September 24, 2007. Any response is due by October 4, 2007.

September 6, 2007

                                        /S/ Francis X. Caiazza
                                        Francis X. Caiazza
                                        U.S. Magistrate Judge

cc:

Counsel of Record
Via Electronic Mail